[Civ. No. 12622.   Second Dist., Div. One.   Feb. 19, 1942.]

DAISY JANSSEN, Appellant, v. COUNTY OF LOS ANGELES et al., Respondents.

HUDSON P. HIBBARD, as Trustee, etc., Appellant, v. COUNTY OF LOS ANGELES et al., Respondents.

Hibbard & Kleindienst and J. Garrison Gemmill for Appellants.

J. H. O'Connor, County Counsel, S. V. O. Prichard, Assistant County Counsel, and J. F. Moroney and Arthur S. Loveland, Deputy County Counsel for Respondents.

YORK, P. J.—The above entitled actions, consolidated for trial, were brought by the respective plaintiffs, the legal owners of adjoining realty abutting the San Gabriel River, to recover damages for injury to their respective parcels of land. The defendants in each case are the county of Los Angeles, the Los Angeles County Flood Control District, C. H. Howell, who for a time was the chief engineer of said district, and Harold E. Hedger, Sr. (sued as Howard E. Hedger, Sr.) who was senior assistant chief engineer of the district from 1934 to 1938 and in charge of the work done in the San Gabriel River in 1935 and 1936, under the supervision of Chief Engineer Howell.

The injury here complained of is alleged to have been occasioned by the changing of the channel of the San Gabriel River by defendant in such a way that portions of plaintiffs' property and improvements were washed away during the heavy rains of March, 1938. The two parcels of land will be

referred to in this opinion as the Janssen property and the Hibbard property.

At the close of plaintiffs' case, defendants' motions for nonsuit were granted and judgments of dismissal were entered. Plaintiffs prosecute this appeal from the judgments of dismissal, as well as from the orders granting the nonsuit. ▇ While a minute order granting a nonsuit is not appealable where it was superseded by a judgment from which an appeal has been taken (*Skaggs* v. *Taylor*, 77 Cal. App. 519, 525 [247 Pac. 218] ; see, also, *Scrimsher* v. *Reliance Rock Co.*, 1 Cal. App. (2d) 382, 390 [36 Pac. (2d) 688] and cases there cited), the propriety of such order may be reviewed upon the appeal from the judgment of dismissal. (Sec. 956, Code Civ. Proc.)

The record herein reveals that a resolution of the board of supervisors of said flood control district, dated October 30, 1935, provided that public necessity required the acquisition by the district of a heavily wooded strip of land across the east end of the Hibbard property for the construction and maintenance thereon of the official channel of the San Gabriel River. Accordingly, the county counsel was directed to institute proceedings for the purpose of condemning an easement across said land. The owner of the Janssen property granted a similar easement to the district.

In June, 1936, under a contract with said district, an independent contractor began installing a row of creosoted pilings driven into the ground approximately ten feet apart, along the west side of the river-bed from Florence Avenue (Easy Street) "upstream several hundred feet to and opposite . . . the Janssen property. On that piling was placed heavy redwood fencing held with wire." The top of the piling was approximately ten feet above the bed of the stream and five or six feet higher than the surface of the land adjoining the easement. Between the line of piling and the new east line of appellants' properties was a thirty-five foot strip of land which was a part of the easement acquired by the district through eminent domain proceedings and the grant from Janssen, as heretofore stated. The material which was excavated from the official channel was placed on this strip of land "back of the row of piling and wire fence . . . in the form of a levee or embankment." Before the contemplated improvement of the channel was made, the river made a sharp bend toward the south as it approached the Janssen property. This bend was changed to a gradual curve to the south in

widening the channel of the river, the north line of the Janssen property being approximately at the center of such gradual curve. In straightening the channel it was necessary to clear away a thick growth of trees from the thirty-five foot strip, above referred to, which theretofore had afforded protection to appellants' land from the ravages of the river. At the time the work was begun there was in existence a row of untreated pilings covered with wire netting, northeast along the westerly bank of the river, commencing at the northerly edge of the Janssen property and extending upstream, but there is no evidence as to when or by whom such work was done.

In March, 1938, heavy rainfall on the drainage area of the river caused a flood which filled the river and washed a strip off the east end of the Janssen property and about 77/100ths of an acre from the northeast corner and east end of the Hibbard property. The flood waters also washed away some of the untreated pilings north of the Janssen property, as well as some of the creosoted pilings; debris and trees were carried back of these pilings, and some of the debris lay upon the pilings which were left in place. A portion of the dike west of the pilings was eroded. The soil on both properties adjacent to the river "is alluvial soil which erodes quite easily."

Appellants contend that respondents "are liable under Article I, Section 14 of the California Constitution because of damage resulting necessarily from planning, constructing and maintaining works that changed the natural channel of the river, and destroyed natural protection from the waters thereof." It is also urged that the court erred in sustaining objections to evidence which, it is claimed, tended to prove not only "the negligence of the District in planning and constructing works which changed the course of the San Gabriel River so as to divert waters upon plaintiffs' lands, but also . . . of taking and damaging private property for public use without compensation."

The consolidated appeal is presented to this court upon a bill of exceptions specifying twenty-seven erroneous rulings of the trial court in sustaining objections to proffered evidence.

■ It is urged by respondents (1) that "the trial court adopted the view early in the proceedings that the Los Angeles County Flood Control District as a state agency is not liable for damages resulting solely from the negligence of its officers and employees," and made its rulings rejecting appellants' prof-

fered evidence "in conformity with such view"; and (2) that "the question of damage to the Hibbard property by the construction of the protection work contemplated in 1935 was completely adjudicated in the eminent domain proceeding."

In connection with point two above, the record shows that respondents were permitted to file an amendment to their answer herein alleging that the right of appellant Hibbard to be compensated for the destruction of the trees upon the parcel condemned was an issue in the condemnation proceedings and was finally determined therein. The judgment roll in the condemnation proceedings was introduced at the trial herein, from which it appears that two issues were presented to the jury in said proceedings, to wit: "First, what was the market value of said parcel (sought to be taken) on the 30th day of October, 1935? Second, the damages, if any, which will accrue to that portion of the land of said defendants not sought to be condemned by reason of its severance from the portion sought to be condemned and by reason of the construction of the improvement of the San Gabriel River in the manner proposed."

On the question of severance damages, the jury was instructed as follows: "Severance damages, so-called, are the amounts to be awarded the defendants when the remaining property owned by them is depreciated in its market value by reason of the severance therefrom of the part sought to be condemned. In this case the taking of the part sought to be condemned will sever from the entire property owned by the defendants a portion of such property and you are called upon to find what extent, if at all, such remaining portion will be depreciated in its market value. In so doing you may consider what detriment, if any, such remaining portion will sustain by reason of the taking and severance therefrom of the part sought to be condemned and the construction thereon of the improvement, to-wit, the removal of all trees therefrom and the construction of a channel for the San Gabriel River. If you believe that such remaining portion will not suffer any depreciation in its market value by reason of such severance, the treatment of the part severed, and such construction, then it is your duty to find that no severance damages shall be awarded.

"If you find from all of the evidence that the property of defendants not herein sought to be condemned has sustained severance damages, you should award to the defendants such

amount as you shall find such property to have been damaged, that is, the difference between the market value of the property on October 30, 1935, and before its severance from the property sought to be condemned in this action, and its value after such severance and with the improvements made in the manner proposed by the plaintiff.''

The record does not disclose that any severance damage was awarded in the condemnation proceedings, and it is so asserted as a fact by appellants in their closing brief, where they call attention to the fact that the only issue respecting the property not condemned ''was the diminution in market value by reason of the severance therefrom of the land condemned and by reason of the *construction* of the improvement; no award was made covering the actual *taking*, i. e., the actual invasion 'by superinduced additions of water' (*Pumpelly* v. *Green* [Bay & M. Canal Co.], 13 Wall. 166 [20 L. Ed. 557]), resulting in the inundation and washing away of plaintiff's land, *thus making it a part of the stream-bed itself.''* (Italics included.)

In *Sutro Heights Land Co.* v. *Merced Irr. Dist.,* 211 Cal. 670, 694 [296 Pac. 1088], the court, quoting from *Farmers' Reservoir & Irr. Co.* v. *Cooper,* 54 Colo. 402 [130 Pac. 1004], said: '' 'In condemnation proceedings all damages, present and prospective, that are the *natural, necessary or reasonable incident of taking the property* sought to be condemned, must be assessed.' '' (Italics added.)

Again, in *Turpen* v. *Turlock Irr. Dist.,* 141 Cal. 1, 3 [74 Pac. 295], it is held that ''damages caused by the seepage from faulty construction of the canal could not well have been anticipated, and were not included in the condemnation proceeding.''

It surely could not have been anticipated at the time of the condemnation proceedings in 1935 that as a natural, necessary or reasonable incident to the improvement of the San Gabriel River, appellants' land would be washed down the river. From what can be ascertained from the excerpts from the condemnation proceedings appearing in the record now before this court, it seems clear that the damages which appellants here allege they have sustained were neither considered nor determined in those proceedings.

Referring to respondents' argument, heretofore noted, to the effect that appellants' proffered evidence was properly rejected in conformity with the view adopted by the trial court

early in the proceedings, it is shown by the record that the greater portion of the rejected evidence was offered in an attempt to prove that the plan for improvement of the channel of the San Gabriel River was inherently wrong in its inception.

Appellant states the major question as follows: ''Does the inundation and washing away of privately owned land abutting a river, resulting from the change by a county and county flood control district of the natural channel of the river, followed by failure to provide adequate protection against, and a waterway sufficient to carry, the water which reasonably might be expected to flow in such river, when such adequate protection and sufficient waterway existed before said change, constitute taking and damaging of private property in violation of Article I, section 14, of the California Constitution?''

Appellants' opening brief sets forth the following under the heading ''Opening Statement'': ''The above entitled actions, consolidated for the purpose of trial and appeal, were brought by Daisy Janssen and Hudson P. Hibbard, Trustee for Kathryn Kleindienst Schlens and Louis Ball Kleindienst, the legal owners, respectively, of parcels of realty abutting the San Gabriel River in the county of Los Angeles, California, to recover damages for injury to their parcels of land occasioned by the *changing of the channel* of said river by the defendants in such a way that portions of said land and improvements were inundated and washed away.

''The complaint in each case alleges that more than one-half of the precipitation and runoff of the waters originating in Los Angeles County occur in the San Gabriel mountain area; that the principal stream of said area is the San Gabriel River which flows in a southerly direction into the Pacific Ocean; that such realty was and is situated on the western bank of the San Gabriel River, a short distance northerly of the point where said river is crossed by a road known as Florence Avenue, formerly called Easy Street, a public highway in Los Angeles County; that during periods of heavy rainfall the flow of water in this river reaches enormous proportions, and, if unchecked, would erode and inundate large areas of land adjacent thereto, which facts were known to defendants and each of them at all times mentioned; that in order to protect riparian lands, other than those of the plaintiffs, from inundation and erosion, defendants Los Angeles County and Los Angeles Flood Control District excavated, widened, straight-

ened and executed works along the banks of said river.'' (Italics added.)

Briefly, it will be seen from the foregoing that the cause of action as argued by appellants is based on the contention that respondents changed the natural channel of the San Gabriel River in such a way that the alleged damage resulted. In this connection, it is not urged that the damage resulted from the negligence of officers and employees of a public corporation, but, that the alleged damage resulted from the negligence of the corporation itself; that ''the negligence or wrongful act of the state agency itself in planning and causing to be constructed works which reasonably should have been expected to,'' did in fact ''cause the damage complained of.'' Quoting from appellants' brief: ''Correctly stated, our contention is that defendants are liable under Article I, Section 14, of the California Constitution, because of damage resulting necessarily from planning, constructing and maintaining works that changed the natural channel of the river, and destroyed natural protection from the waters thereof. Not only was this point an issue raised by the pleadings, but evidence was offered and rejected in proof thereof . . .'' Again quoting from appellants' brief for the purpose of setting forth in greater detail appellants' position, the following appears:

''For the convenience of the Court, and because of its importance to the real issues of this case, we quote the question as to which objection was sustained resulting in this exception:

'' 'Assuming that the work and the plan thereof consisted of piling or posts driven into the ground at intervals of ten feet, with heavy fence wire nailed to it on the river bed side, while piling or posts were driven in a line parallel to and 35 feet east of the easterly line of the present Hibbard-Kleindienst property, which piling or posts so driven extended from a point east of the northerly line of said property to Easy street, and that in connection with said piling an excavation was made on the east side thereof to the avenue level, and that the dirt from said excavation was placed on the west side of said line of piling or posts to act as protection against the flood waters that might get through the fence; basing your answer upon these assumptions, I will ask you, was such a plan and construction proper engineering?'

''We reiterate that respondents admit the witness' qualifications as an expert. Each assumption made in this hypothetical question was either actually in evidence or covered by

an offer of proof that it was an accomplished fact and, in addition, was shown to have been a part of the *plan* under which defendants performed the work. The specific question based on this assumption goes to the very heart of the point at issue: Was the *plan* and *construction* proper engineering? In other words, was the *plan* inherently *dangerous* and *wrong?* If the answers to these questions were negative and affirmative respectively, it follows irresistibly that the *District itself,* as distinguished from its servants and employees, performed a wrongful act as to which it cannot claim immunity.'' (Italics included.)

In other words, it is appellants' contention, adopting substantially the language of appellants' brief, that if the Flood Control District, as a governmental agency, by planning and causing to be constructed works which were inherently dangerous and wrong, even though negligence of the governmental agency itself be a part of such planning and construction, all as distinguished from mere misfeasance of agents, servants and employees in negligently executing a proper plan, caused the injury complained of, such governmental agency must respond in damages.

The respondent Flood Control District's reply to the above argument is as follows, quoting from respondents' brief: ''The improvements constructed by the District did not divert or propel the water of the river upon plaintiffs' lands. They merely failed to prevent said waters from going in the direction which they would have gone if there had been no protection work there at all. The plaintiffs were damaged *in spite of* what defendants did, not *because of* what defendants did.'' (Italics included.) Perhaps a more accurate statement would be, that the improvements merely failed to prevent said waters from going in the direction which they could or might have gone, if there had been no protection work there at all. Whether they ''*would* have gone'' is problematical. That the waters did in fact follow such a course is conclusive proof, however, of the possibility that they could or might do so.

Before giving further consideration to the contentions of the parties, it is important at this point to describe the San Gabriel River and as well the character of the territory traversed by its waters. For that purpose, although a matter of common knowledge, a description by those peculiarly qualified may be adopted with propriety. Referring to the territory

as a large continuous plain, Mr. Fenneman describes it as follows: .

"This plain represents mainly the combined deltas of the Los Angeles, San Gabriel and Santa Ana Rivers. Like the plains more remote from the sea, this one is therefore composed of detritus washed down from the mountains. . . .

"The western (area) traversed by the San Gabriel River is separated by the San Jose Hills from the larger eastern basin of the Santa Ana River. The alluvial slope near the mountains may be as steep as 500 feet to the mile, but it quickly flattens and near the southern margin may be 50 feet to the mile. . . . In this arid climate and with this porous material, such slopes are insufficient for erosion, and the surface of the plain remains essentially without local relief. . . .

"The streams of this section are actively degrading their mountain courses and are aggrading their valley reaches with corresponding rapidity. The amount of porous alluvium already laid down is so large that all streams sink in and disappear within a few miles of the mountain base, sometimes within a few hundred feet. Beyond the point of their disappearance in dry weather, their courses may be traced as dry 'washes' or 'sand washes,' used only in time of flood when the stream reaches farther out on the alluvial slope. Such stream courses commonly consist of a network instead of a single channel. The larger streams have more or less continuous washes reaching to the sea but all such streams are 'interrupted,' i. e., their courses consist of alternating stretches of dry wash and flowing water. Where the alluvium is deep and porous, the water percolates slowly through it in a down stream direction but does not appear at the surface except in time of flood. Where the underlying rock approaches the surface and obstructs percolation, the stream flows at the surface." (Physiography of the United States by Nevin M. Fenneman.)

Mr. Hill, in referring to the San Gabriel River, among others, describes them as follows:

"It is a further anomaly that the older portions of our rivers, as seen in the areas of our valley plains, are apparently the least indented ('canyoned'), inasmuch as their traces are constantly being filled and abandoned by processes of distributive aggradation." (Robert T. Hill, Southern California Geology, p. 215.)

Manifestly, the above descriptions refer to conditions in their natural state. It is at once evident that from the very nature and character of the underlying processes that built the coastal plain, above described, the waters of the so-called San Gabriel River, in their natural state, were migratory. Such conditions existed at the time the lands first passed from their wild and natural state to the state ordinarily subject to civilized use. Such uncontrolled waters were a constant menace to landowners, for the processes of aggradation were bound to continue until and unless such waters were controlled.

It is further an historical fact and a matter of common knowledge that the San Gabriel River, until recently, flowed over and across lands privately owned. Under such conditions, it was only natural that landowners undertook to and did in fact in many instances protect their land against vagrant waters and flood damage as well. This action on the part of some owners only increased the hazard as to others, but the common enemy rule under such circumstances clearly applied and no liability accrued. As a result of such individual efforts, however, the waters of the San Gabriel River had the appearance of a channel at various points throughout its general course, but such channel obviously was artificial and at most only temporary.

It was the above described condition, which is a matter of historical and common knowledge, that the respondent Flood Control District sought to remedy.

Pursuant to such a purpose, a strip of land was purchased or condemned, within which it was intended the waters of the so-called San Gabriel River should be confined and a definite channel thereby established.

Returning now to a consideration of appellants' contentions, it is at once apparent that the argument, in substance to the effect that respondent Flood Control District changed the natural channel of the San Gabriel River, is untenable. The further contention that the so-called *"plan"* was "inherently dangerous and wrong" is equally untenable. The argument, which is clearly fallacious, proceeds from a false premise, and evidently is the result of not only a confusion of terms, but also an unwarranted assumption of facts. Whether by the term "plan" is meant the purpose of the Flood Control District to confine the waters in a single definite channel, or the manner in which such purpose was to be effected, in either case the invalidity of the argument remains, for obviously

neither the purpose nor the manner can be successfully assailed as inherently dangerous and wrong. It may be true that the specifications may have been faulty and as a result inadequate dikes or barriers constructed, but such faults at most merely indicate errors of judgment of employees of the district, and in no sense signify anything inherently dangerous or wrong in the "plan."

Equally without merit is the argument that respondents changed the natural channel of the river. In this connection it is significant that the channel is not alleged to be permanent. Had the facts and the evidence thereof supported such a description, other doctrines clearly would apply. But, the nearest approach to an allegation of permanency in the Janssen case is, "That the natural channel of said river had *from time immemorial* served as a sufficient waterway . . ." And in the Hibbard case, "That several acres of plaintiff's realty consisted, prior to works and alterations erected by defendants, as hereinafter more fully set forth, of a dense stand of large cottonwood, oak, elm, black walnut and willow trees which *from time immemorial* had served to turn the flow of water to the south and at the same time protect plaintiff's realty from being washed away." The expression "from time immemorial" is but the counterpart of the expression "since the memory of man runneth not to the contrary." Such expressions are only the poetic equivalent of "a long time" which, being purely relative, therefore is indefinite. In no sense can such phrases be regarded as allegations of permanency. Nor indeed could it be truthfully alleged that the waters of the San Gabriel River at any time ever flowed in a permanent channel. The geological history of the area, as above described, definitely refutes such a contention. The conclusion is inevitable that, in so far as the asserted cause of action here considered is concerned, it cannot be based on the alleged changing of a channel when the fact is there was no channel to change. The action of the Flood Control District was an effort to locate, establish and maintain a channel, but not to change one.

It should be noted that, under the circumstances alleged in the complaints herein, no duty, legal or moral, devolved upon the state to come to the rescue of landowners. Moreover, although the state may undertake to reduce or remove such menaces, no guaranty of complete success accompanies such an undertaking, and occasional failures of the

character here considered create no liability. It may be that unfortunate victims may dispute the justice of such a doctrine, but on the other hand, if it were otherwise there would be slight if any incentive for the state to extend its aid at all.

Plaintiffs, *ab initio*, had no cause of action. That there is no liability for negligence of employees of the Flood Control District, there can be no question. But a cause of action based on the alleged negligence of the Flood Control District does not necessarily follow. The attempt to differentiate between the employees and the district, as such, and by a circuitous process of reasoning assail a so-called "plan" as negligent, does not affect the conclusion, above noted, that no cause of action exists. Therefore, there can have been no error in granting the motions for nonsuit.

The appeals from the orders granting the motions for nonsuit are dismissed, and the judgments appealed from are affirmed.

Doran, J., and White, J., concurred.

A petition for a rehearing was denied March 16, 1942, and appellants' petition for a hearing by the Supreme Court was denied April 16, 1942. Curtis, J., and Carter, J., voted for a hearing.